## Price's Administrator *vs* Boswell &c.

CHANCERY.

ERROR TO THE FAYETTE CIRCUIT.

*Equity. Jurisdiction. Evasive answer. Fraud. Trus-*  Case 7.
*tee on Equity.*

JUDGE EWING delivered the opinion of the Court.  *September* 9.

In 1819, George Norton was largely involved in debt, The allegations
and in failing circumstances. Among other debts, he of complainant's
owed to the Bank of the United States, one debt of
$4,500, for which Venable was indorser, and his estate
afterwards paid the debt; another for $2,000, on which
John R. Price was indorser, and afterwards paid, and
which is the foundation of this suit; and a third, which
was originally for $3,000, on which S. Keene and Bush-
rod Boswell were indorsers. To indemnify the latter in-
dorsers, in 1818, George Norton had executed a deed of
trust to Richard Hawes, and in September, 1819, Hawes
made a public sale of the trust property, consisting of
eight slaves, for the aggregate sum of $2,380, and Tho.
E. Boswell became the purchaser, directly and indirectly,

PRICE'S ADM'R.
*vs*
BOSWELL &c.

of Charles, at $340; Cate and child at $525; Lewis at $350; Peter at $565; and Jerry, who was claimed by a daughter of Norton, and was not present at the sale, at $90, making in the aggregate, $1,870; and John Brand became the purchaser of Let and child at $510. The sale was made on a credit of sixty days, and Brand paid down $500 for his purchase. All the slaves purchased by Boswell, except Peter, were permitted to return to the possession of Norton, where they remained for years, as Boswell contends, on hire, at agreed prices, and bonds executed by Norton *alone*, for the hire, are exhibited. The note on which Keene and B. Boswell were indorsers, had been reduced, prior to the sale, to $1,750, and at the first renewal after the sale, it was reduced to $1,200; which reduction, it is believed, was effected by $500 paid down by Brand, and the balance paid by T. E. Boswell indirectly; and thus reduced, it was renewed, by and in the name of Norton, with the same indorsers; Norton paying the discounts, until some time in 1824, when it was paid off by T. E. Boswell. In the mean time, Norton was engaged largely in manufacturing and re-handling and prizing tobacco for Boswell. Separate judgments having been recovered against Norton and Price, by the Bank of the United States, and the former having been committed to jail and taken the oath of an insolvent debtor, and the latter having paid a part of the debt, and afterwards the whole, Norton assigned to him, in 1825, a large account, which he claimed to hold against T. E. Boswell, for snuff and manufactured tobacco sold to him, and tobacco furnished by Boswell and manufactured and re-handled and prized for him by Norton as his factor, and for kegs and nails furnished him in the above business. Price being unable to settle with Boswell, filed his bill against him and Norton, in which he exhibits the account, distinctly drawn out, amounting in the aggregate, to $2,685 85, and charges that Boswell was to pay Norton as charged in the account, two and a half cents per pound for manufacturing his tobacco, and one half cent per pound for re-handling and prizing, and in addition thereto, was to pay the one half of the net profits, the amount of which he, Norton, had never been able to ascertain from

Boswell. The account exhibited purports to have accrued in 1820, 21 and 22, running through nearly the whole of these three years.

Boswell answered the bill, admitting the insolvency of Norton, and also that during those three years, he purchased a large quantity of tobacco, which he employed Norton to manufacture; and during the same period, engaged him to re-handle and prize such tobacco as might require it. That he delivered to him to be manufactured, 93,043 lbs., for which he holds Norton's receipts, which was to be manufactured at the price charged in the account of Norton, in Commonwealth's paper, and his tobacco was to be re-handled and prized for the price charged, in Commonwealth's paper, but denies that Norton was to receive any of the net profits on the sale of the same. He also denies explicitly, the nine first items in Norton's account, which are for snuff, cigars and manufactured tobacco sold to him, which amounts to about $1,103 24, and runs from 1st of April to the 9th of August, 1820. As to the other items of the account for manufacturing and re-handling and prizing tobacco and furnishing kegs, nails, &c., he says that he does not *recollect* the quantity of manufactured tobacco which he received of Norton, nor has he *any means of ascertaining* the amount, but *believes* that Norton regularly got receipts from him for the quantity. However, he *believes* the account filed to be *untrue*. He never, to the *best of his knowledge*, received of Norton the amount charged, and calls upon the complainant to prove the amount. He also says that he *does not recollect* the number of kegs and hogsheads he received from Norton, nor is he able, from any *memorandum* in his *possession*, to ascertain the *number*, but *believes* that he regularly gave Norton receipts for the number received, and calls on him for proof. He also says that he does not recollect the quantity of tobacco re-handled and prized by Norton, but *believes* the quantity to be *much less* than the quantity charged, and requires full proof, and that Norton be allowed *no more* than he *proves*. He sets up as a set-off against so much of the account of Norton as may be proved, a claim for the hire of the slaves of Norton, which he purchased at the sale

PRICE'S ADM'R.
vs
BOSWELL &c.

made by the trustee, Haws, except Peter, and exhibits bonds for their hire, bearing date in September, 1819, which were renewed as to part of the slaves, in September, 1822, and as to the rest, in January, 1823, and the account for hire is charged up to some time in the year 1824; he also exhibits a note on Norton for $20 40, dated February 20th, 1820, as a set-off.

Afterwards the complainant filed an amended bill, in which he charges that the claim for hire, sought to be set-off, was spurious; that the slaves were Norton's, and Boswell had never paid any thing for them; that they were held in Boswell's name *in trust* for Norton, and to cover them from Norton's creditors, and that the notes for hire of 1819, were given with that view and to *rescue them from the Sheriff, who had seized them under execution*, and to that end were *ante-dated*, having been executed *long subsequent* to the *time they bear date*.

Boswell answers the amended bill and denies the fraud, also denies that the bonds for hire were given for the purpose of *misleading* the *Sheriff*, or deceiving any of the creditors of Norton, but fails to deny that the slaves had been *seized by the Sheriff*, or that the bonds were *ante-dated*, though in addition to the specific charge, he was specially interrogated in the amended bill, upon those points. He says that he purchased the said slaves at the trustee's sale, and *assumed* of the debt an amount equal to his purchase, and according to his *best recollection* and *belief* $300 more, and *afterwards* paid the same, and claims the slaves as his own from the time of his said purchase, and claims the hire as a set-off. He also alledges that Jerry had been recovered from him by the daughter of Norton, and that Charles had been taken to Maryland by the brother of Norton, by his consent, and was never returned; and he claims the price and hire of those two slaves as a further set-off.

An Auditor was appointed, who examined the books of Norton, heard proof, reduced the accounts to a specie standard, and made report, presenting the accounts in several different aspects, and submitting the whole to the consideration of the Chancellor.

John Price having died, and the suit having been re- vived in the name of his administrator, the Court, upon the hearing, dismissed the bill as to Boswell, and decreed Norton to pay the debt to the complainant. And from this decree the complainant has appealed to this Court.

The answer of Boswell to the nine first items in Norton's account, is full and explicit, and amounts to a direct denial of those items, and there being no proof to sustain them, they must be rejected. As to the other items, his answer is general, evasive, and in effect amounts to an admission of the account. He does not answer as to the specific charges or items in the account. And though he seems to have set down and preserved, with the care of a merchant, one side of the account, that in his favor, and answers explicitly as to it, when he comes to the other side, his memory fails him, he does not *recollect*, he *believes* that Norton got receipts, he *believes* the account filed to be *untrue*, he never, to the *best* of his *knowledge*, received of Norton the *amount charged* and calls upon him for *proof*.

A bill in Chancery requiring an answer, is an appeal to the *conscience* of the defendant, and he is required to open his conscience, as an honest man, and to answer fully, fairly, and honestly, so as to enable the Chancellor to render a just decree upon the merits of the case, between the parties. And when a distinct and positive charge is made of events, or facts accruing within six years, the answer must be positive, and not according to the *belief* of the respondent. Qualifying words, which are too frequently used as a salvo to the consciences of those who are not willing to confess the truth and whole truth, against their interest, are not admissible, *Story's Pleading*, 656. The case of usurers is a common one, in which such qualifying words are used. Their memories are said to be frail, they "can't remember," they "don't think it can be so." Such language has been adjudged to be evasive, and to amount to an admission of the usury positively charged, 5 *Dana*, 85. And so in the case under consideration, after a clear admission that a large quantity of tobacco was manufactured and re-handled and prized, and kegs, &c. furnished, at the price charged;

*Price's Adm'r.*
*vs*
*Boswell &c.*

Example of an evasive answer amounting to admission.

PRICE'S ADM'R.    an answer that he does not *recollect* the *precise* quantity,
    *vs*
BOSWELL &c.       he *believes* the account to be *untrue*, and never, to the
best of his *knowledge*, received of Norton the *amount charged*, and *calls upon him* for *proof* of the whole, without denying the account *positively* or specifying the *true amount*, or how much the account *exceeds* the *true amount*, must be taken as unfair and evasive, and to amount to an admission of the *probable* correctness of the account exhibited. If it were not so, in the absence of proof, or in a case of the entire inability of the complainant to make proof of the *precise* amount, he would be made to lose the *whole*, in the face of the *implied* admission of the respondent, that the *greater part*, and probably the *whole amount* was correct. For, as to the *whole amount*, Boswell has not ventured to make a *positive* denial, but qualifies his denial by the saving words, *he does not recollect*, he *believes*, to the *best* of *his knowledge*, &c. and then magnanimously calls upon Norton to *prove* the *amount* or *lose all* that he is unable to prove. The account of Norton may be substantially correct, and yet the answer be, in letter, true, according to the construction which he may put upon it, and his conscience saved from any violent rent. He does not *recollect* the quantity received; it may be true that he does not bear in mind the *precise* quantity, and yet have good reason to know that the quantity charged is *substantially* true. "He *believes* the account charged to be untrue;" it may be untrue as to a few pounds or as to a small item, and yet substantially true and correct as to the aggregate. "He never, to the *best* of his *knowledge*, received the amount charged;" he may not have used the proper exertion to acquire a correct knowledge as to the amount, and after acquiring it, to show *how much* he did receive or lacked of receiving the quantity charged; he may have failed to receive an inconsiderable quantity only. "He has no *memorandums* or *means*" to arrive at the quantity; he may not have been able to arrive at or ascertain the *precise* quantity. to a pound or a few pounds; yet by exertion and a due regard to fairness, he may have ascertained with reasonable certainty, the quantity received, or near about the quantity.

The tobacco manufactured, was not used or sold out in <span>PRICE'S ADM'R.<br>*vs*<br>BOSWELL, &c.</span> small parcels, by Boswell, but was sent off by him to remote points, Maysville, Louisville, Pittsburg, &c. and placed in the hands of commission merchants to sell. It is passing strange and unaccountable, that Boswell, a regular merchant, doing business upon a large scale, kept no accounts of the quantities of tobacco sent off and placed in the hands of others for sale, nor of his receipts upon those sales, nor retained the receipts of wagoners or the bills of lading. Had he done so and looked into those accounts, or searched those receipts or bills of lading, or accounts of his commission merchants, he might have arrived at reasonable certainty as to the correctness of the account exhibited. Nor can we indulge the presumption that those accounts, receipts, &c., were not kept, or in the absence of any suggestion as to their loss or destruction, that they were not in being at the time when the answer was filed, and the more especially as he seems to have preserved, with scrupulous care, the receipts of Norton, showing the credit side of his accounts with him. And there is no evidence that he had less confidence in Norton than he had in others with whom he dealt in tobacco; so far from it, it appears from the facts in the record, that he had entire confidence in him.

Again, in corroboration of the correctness of the account, the quantity charged corresponds with the quantity delivered to Norton to be manufactured and re-handled, deducting the accustomed proportions for loss in reducing the tobacco to a manufactured state; and that though Boswell was, from the proof, nearly every day in the factory of Norton, superintending the work, and having every opportunity to inspect the books and to know whether his tobacco was honestly manufactured and delivered, we hear of no complaint during the time that Norton was engaged in his business, nor for years afterwards, nor until the answer is filed in this case; and even in it, he does not venture to make a direct charge against Norton, of using, embezzling, or misapplying his tobacco, but upon the evasive allegation that "he does not *recollect*," "he *believes* the account incorrect," requires Norton to prove that he re-delivered all the tobacco in a manufactured, re-

PRICE'S ADM'R.    handled and prized state, which he had delivered to him
*vs*              for that purpose.   Moreover, it appears that Norton has
BOSWELL &c.       been enabled to pick up scraps of testimony, at remote
                  points, showing that during the period that he was manu-
                  facturing tobacco for Boswell, Boswell consigned large
                  quantities of the article to persons in Maysville, Pitts-
                  burg, and other places, in some instances accompanied
                  with letters extolling the tobacco as of Norton's manufac-
                  ture, and promising large quantities more, and asking a
                  better price for it, by reason of its being of his manufac-
                  ture.

Upon the whole, we are satisfied that the account of
Norton should be taken as substantially correct, excluding
the nine first items, which have been explicitly denied,
and are unsustained by proof.   The amount so to be taken
as true, when reduced to a specie standard, according to
the Auditor's report, with interest thereon up to the 27th
September, 1824, amounted to $1,318 03.   Against this
sum  Boswell sets up counter demands more than suffi-
cient to cover and off-set it, for slave hire, the price of
slaves, and a due bill, if his claim be allowed ; and we
will now consider whether they ought to be allowed or
not.

The complainant, though he claims under Norton, as
The complain-    assignee of his account, also claims as a creditor, and
ant's right as a
creditor to inves- has a right to resist the set-off, if they originated in fraud.
tigate the fraud  A Court of Equity will not help Boswell to set up his
between debtor
and creditor.     demands as an off-set and extinguishment of the demands
of Norton, which are asserted, by reason of his insol-
vency, for the payment of his debts, if those demands
originated in a fraudulent contrivance and pretended ar-
rangement between Boswell and Norton, to cover over
his slaves and their profits from the just demands of Nor-
ton's creditors.   And to the end of making resistance to
such set-off, it is not necessary for the complainant to be
a judgment creditor.   Indeed it may be doubted whether
Norton himself might not, in a Court of Equity, success-
fully resist such sets-off.   If the slaves were held in the
name of Boswell, in secret trust for the benefit of Nor-
ton, then their profits were Norton's and ought not, in
equity and good conscience, to set-off against demands

justly due from Boswell to Norton, for work and labor done, which should be applied towards the payment of his honest debts. That they were so held we are satisfied from the facts in this record, subject however, to the indemnification of Boswell, in case he paid the balance of the debt to the Bank. We will enumerate some of the facts in the record, which have brought us to this conclusion.

The debt to the Bank, to secure which the slaves were conveyed in trust, had been reduced to $1,750, and had been renewed from time to time, at that sum, without a call, the discounts or interest only being paid, up to the sale of the slaves, and being reduced to $1,200 at the next renewal after the sale, by the payment of the money by Brand for his purchase, and a small sum in addition; it was renewed at that sum, from time to time, by Norton, he paying the discounts, with the same sureties, up to some time in 1824; about which time Boswell obtained the possession of all the slaves in possession of Norton, and paid off the $1,200; and about that time, or shortly afterwards, a controversy commenced between Norton and Boswell, about the slaves and about their accounts. Now why the necessity of hastening the sale of the slaves, if the Bank was content to indulge Norton, unless the object of the parties was to place the property, which exceeded in value the balance of the debt, in a more secure condition against the claims of Norton's other creditors? If the Bank required the further reduction of the debt to the $1,200, the amount to which it was reduced by Brand's purchase, why were more of the slaves sold than were necessary for this object, and especially when they were all the slaves that were owned by Norton? Were Norton's sureties demanding the sale as the means of releasing themselves from responsibility? We have no evidence of the kind, and the supposition is contradicted by the fact, that they were content to stand as his sureties, and did so stand and aid him in renewing the note, up to the time it was paid off. But if the sole object of the sale was to pay the Bank debt, why were more of the slaves sold than were necessary for that purpose? And why was Jerry sold when he was not present?

*(margin, right of first paragraph)*
PRICE'S ADM'R.
*vs*
BOSWELL &c.

*(margin, right of second paragraph)*
Circumstances indicating fraud between Boswell and Norton, and determined to be inconsist'nt with fair dealing and therefore fraudulent. Boswell held to be a trustee for the benefit of creditors of Norton.

PRICE'S ADM'R.
        *vs*
BOSWELL &c.

Boswell says in his answer, that he assumed to pay an amount of the Bank debt equal to the amount of his purchase, and he *believes* about $300 more. Now it turns out that his *belief* in this matter is as short of the truth as his *belief* and *recollection* may have been with respect to Norton's accounts; for the amount of his purchase exceeds the amount of the Bank debt by $120, and including the purchase of Brand, the amount of the sale of the slaves exceeded the Bank debt $630.

But if the sale was *bona fide,* and intended for no other object than to pay off the Bank debt, why was not the proceeds so applied, or so much of them as were necessary to that end? And why did Norton continue to renew it and pay the discounts, and treat it in all respects as his own debt, for years after the sale? If the slaves, by the purchase, were to be the property of Boswell, Norton's property had paid the debt, and more than paid it by $630, and Boswell held the property of Norton to that amount more than the debt.

If Boswell *assumed* the payment of the debt, why did he not pay it, or take up the note of Norton, and renew it in his own name? If the slaves were his, the debt to the Bank was his and not Norton's, and it was his business to renew and not Norton's; and more especially was it his business to pay the discounts, and not Norton's, who was poor and hard run, and not in a situation to pay his own just debts. That if the slaves were Boswell's by the purchase, and were intended to vest in him as his own absolute property, why did he permit them all, except Peter, to return immediately to the possession of Norton, who was notoriously insolvent, upon no other security for their hire, than Norton's individual bond, and those bonds renewed but once in five years, and that renewal at an interval of about three years after the sale? No change of possession seems to have taken place for about five years after the pretended purchase; but Norton was permitted to possess and use the slaves as before the sale. And though the sale was public, and made by a trustee, and for that reason the continued possession might not be deemed, *per se,* fraudulent, it has been repeatedly determined by this Court to be evidence of fraud.

The foregoing circumstances are irreconcilable with the conclusion, that the sale and purchase was fair and honest, and intended to vest the property absolutely in Boswell, with the view to apply the proceeds to the extinguishment of the Bank debt, but are perfectly reconcilable with the conclusion that the sale was brought about and the title vested in Boswell as the friend of Norton, the better to cover and secure the slaves from the demands of other creditors; and that Boswell was to hold them in *trust* for the benefit of Norton, he Norton, paying the balance of the Bank debt, and perhaps to indemnify Boswell for his assumpsit to pay the Bank debt, if ever such assumpsit was made, or for his payment of the same in case Norton should fail to pay it, and the liability should fall on his sureties.

To procure the means to pay it, it seems that shortly after the purchase, he went to work for Boswell, and earned about an amount sufficient to pay the debt, in the mean time paying out of his own pocket, the discounts upon the debt, and renewing .the note. Boswell having failed and refused to pay Norton for his labor, the war commenced, and Boswell took possession of the slaves, except Charles and Jerry, and paid off the debt to the Bank.

In addition to the circumstances referred to, illustrative of the object and intention of the parties, is the conclusive fact, resulting from the evasive answer of Boswell, to the distinct charge in the bill, as to ante-dating the notes of September, 1819, and the object of doing so, and use made of them. Boswell fails to march up to and answer the distinct charge, but contents himself with answering in the following general and evasive terms: "That immediately after his purchase, he hired the slaves to Norton; that Norton executed to him, from *time* to *time*, notes for the hire of the slaves, and among them, as he *believes* and charges, was the note of September, 1819. He does not, however, pretend to say with certainty, that said note was founded on that consideration. Many years have passed since its execution, and many circumstances connected with the whole transaction have, no doubt, escaped. He is confident that no writing was given or note

executed by said Norton to him, for the purpose of *misleading* the *Sheriff* or of *deceiving any of the creditors* of said Norton." He fails, wholly, to respond to the charge that the notes were *ante-dated,* or that they were *ante-dated,* and *exhibited,* and *used,* for the fraudulent purposes charged. These facts must, therefore, be taken as true against him, and being so taken, in connection with the other circumstances alluded to, settles the controversy against the demands set up by him.

The price of the slaves, Jerry and Charles, for the same reasons, cannot be allowed. The price of the other slaves purchased by Boswell, and which he has obtained the possession of, exceeds the amount which he paid to the Bank in discharge of Norton's debt, by $183 65, after allowing for the $56 35 evidenced by the extract exhibited from the books of Boswell & Co. The slaves that he got satisfied him for the amount of Norton's debt he paid, and $183 65 over. And he got possession of the slaves about the time he paid it, and of Peter long before; he should, therefore, account for the $183 65 to the complainant as creditor.

Adding this amount, therefore, to the $1,318 03, the amount of Norton's account allowed, and deducting therefrom the due bill of $20 40, exhibited by Boswell, with interest on the same up to the 27th September, 1824, up to which time the interest upon Norton's account has been carried, and a balance of $1,475 76 will be found against Boswell. Upon this sum Boswell is chargeable with interest from the 27th September, 1824, up to the present time, as he has had the use, profits, and increase of the slaves from the same time, and at that time should have paid off Norton's account with interest. The interest, which amounts to $1,590 13, being added to the principal, makes the aggregate sum of $3,065 88, for which amount the complainant is entitled to a decree, if the Chancellor below had jurisdiction of the suit.

And we think he had, upon some one or all of the following grounds: Price's demand against Norton was an equitable one, it being money paid by him as Norton's surety. The account on Boswell was not assignable, but by the transfer, it being made to secure Price, he held it

as *cestui que trust*, and in the nature of a mortgage. As *cestui que trust*, or as mortgagee. his proper remedy was in Chancery. But Norton occupied the condition of *factor* or receiver. He received Boswell's tobacco, was to manufacture it, and re-deliver it in a manufactured state, and there were mutual accounts between them as between factor and employer, to be settled: 1 *Maddox's Chy.* 87–8. Had there been no fraud, then there were mutual accounts, unliquidated, between Norton and Boswell, not only for the tobacco delivered, but for the hire on one side, and on the other for the service in manufacturing, and kegs, nails, &c. found; but there being fraudulent off-sets set up by Boswell, and a refusal to settle on his part, unless those fraudulent claims were allowed, it was competent for the Chancellor to take jurisdiction to remove those fraudulent claims, and to give to the complainant, as a creditor, the full benefit of the accounts which he held in trust for the satisfaction of his just demand.

It is, therefore, the opinion of the Court, that the decree of the Chancellor be reversed and cause remanded, that a decree may be rendered against Tho. E. Boswell, in favor of the complainant, for three thousand sixty-five dollars eighty-eight cents, ($3,065 88,) in part satisfaction of his intestate's debt against Norton, with costs. And the plaintiff in error is also entitled to his costs in this Court.

*Robinson & Johnson* for plaintiff: *Hickey* for defendant.

& another mortgagor, and decree any balance against such holder of debtor's funds, at the instance of creditor, and especially as the debtor occupied the attitude of factor or receiver to such mortgagee or third person.

